IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                          :
SCOTT POWELL                              :        3:16 CV 1653 (RMS)
                                          :
v.                                        :
                                          :
JILL JONES-SODERMAN                       :        DATE: JANUARY 14, 2020
                                          :
-------------------------------------------------------x
```

<u>MEMORANDUM OF DECISION</u>

The plaintiff, Scott Powell, commenced this action against defendants Jill Jones-Soderman[1] and the Foundation for the Child Victims of the Family Courts ["FCVFC"] alleging that Jones-Soderman posted statements on a public website falsely accusing him of physically and sexually abusing his children.  Powell asserts claims for defamation *per se*, invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotional distress.  (Doc. No. 1, ¶¶ 9-12). On December 22, 2017, United States District Judge Michael P. Shea dismissed FCVFC from this case.[2]  On April 15, 2019, the Court (Shea, J.), denied Jones-Soderman's Motion

---

[1] Jones-Soderman has proceeded *pro se* through the duration of this litigation but has received the assistance of counsel on several occasions.  In April 2018, Jones-Soderman "commissioned outside counsel to draft a motion for judgment on the pleadings. . . . Outside counsel completed the subject motion and transmitted it to Defendant by email on or about April 30, 2018." (Doc. No. 38 at 2).  Accordingly, the Court (Shea, J.) treated such "as if it was filed by an attorney." (Doc. No. 43 at 3 n.1). On August 26, 2019, the undersigned granted Jones-Soderman's Motion to Appoint Counsel and appointed stand-by counsel to assist her, in the orderly presentation of this case in the final pretrial stage, and during the course of trial.  (Doc. No. 61; *see* Doc. Nos. 63, 74, 76-77, 86-87).

The Court thanks Attorneys David Keeler Ludwig and Thomas K. Hedemann for their valuable *pro bono* service.

[2] *See* Doc. No. 31 ("In light of the Court's Order granting the motion to quash proof of service with respect to [the] [d]efendant [FCVFC], and the fact that [the] [p]laintiff has not since 'allege[d] conduct that would make the foundation subject to suit under [Conn. Gen. Stat.] § 33-929,' . . . or demonstrated that the defendant has been properly served, the Court will dismiss the case as to [the] [d]efendant [FCVFC] and the case will proceed against [the] [d]efendant Jill Jones-Soderman only, unless, within 14 days of this order, either party shows cause why the Court should not take this action."); *see also* Doc. No. 33  ("No party has filed a document showing cause as to why [the] [d]efendant [FCVFC] should not be dismissed from this action. In light of the Court's . . . Orders, the case is dismissed with respect to [the] [d]efendant [FCVFC]. The case will proceed against [the] [d]efendant Jill Jones-Soderman.").

for Judgment on the Pleadings (Doc. No. 43), and four days later, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 44). The case was transferred to Magistrate Judge Donna F. Martinez (*id.*), and then reassigned to the undersigned on June 20, 2019. (Doc. No. 49). Following a Joint Stipulation to Waive Jury Trial (Doc. No. 70), this case was tried to the Court on October 21-23, 2019. (Doc. Nos. 92, 94-96). Scott Powell, Jill Jones-Soderman, Cynthia Diehl and Rick Diehl testified. On October 21, 2019, Jones-Soderman filed a Motion for Judgment on Partial Findings. (Doc. No. 91).[3]

For the reasons set forth below, the defendant's Motion for Judgment on Partial Findings (Doc. No. 91) is DENIED. Judgment shall enter in favor of the plaintiff in the amount of $100,000.

I.     FACTUAL FINDINGS

In their Joint Trial Memorandum, filed on July 12, 2019, the parties stipulated to the following uncontroverted facts:

Jill Jones-Soderman is the founder and director of the FCVFC. (Doc. 1 ¶ 4). The following words/phrases appeared on the website of the FCVFC:

1. Living with Powell is "a death sentence" for his children;

2. Powell is a "vicious abuser" of his children;

3. Powell is an "accused child abuser";

4. Powell's good reputation in his community is "based on the reluctance of those too fearful to take on the rage and intimidation to report him for crimes for which he should have been reported";

---

[3] A judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure permits a district court to enter judgment before the end of a non-jury trial on any claim, "[i]f a party has been fully heard on an issue[,]" and under the controlling law, the claim or defense can be maintained or defeated only with a favorable finding on that issue. "A court may, however, decline to render any judgment until the close of evidence." Fed. R. Civ. P. 52(c).

5. Powell, on an ongoing basis, "hits the buttocks of his younger daughter," and is "grabbing/patting [her] buttocks" and the breasts of his older daughter;

6. Evidence of sexual assaults being committed by Powell upon his minor daughters "are now on camera . . .";

7. Powell is "an accused child sexual abuser [who has been elevated] to the position of teacher in a program alerting parents to sexual abuse in the camp program, where he has been a long time camp Director at Woodway Country Club, in Darien, Connecticut. This camp Director has an institutional history, though undisclosed, of inappropriate behavior with teenage girls and children. He no longer works as a teacher, but rather as a carpenter in his own business";

8. Powell has "threatened and intimidated" his daughters;

9. Powell is comparable to other prominent child abusers and "the accused abuser, Scott Powell will not be allowed to languish under the veil of secrecy. He has forcibly, through threats, intimidation . . . been able to hide in plain sight. We expect that Scott Powell's reign of terror over his children . . . will not be allowed to prevail . . .";

10. One of Powell's minor daughters (whose name was published) "was the major target of Scott Powell's aggressive abuse" while the other minor daughter (whose name was also published) "was the target of Scott Powell's most aggressive sexual incursions."

Based on the entire record developed during trial, comprised of credible testimony and admitted exhibits, the following constitutes the Court's findings of fact pursuant to Fed. R. Civ. P. 52(a)(1):

Jill Jones-Soderman is a psychiatric social worker and a psychoanalyst by training. She received her Masters' degree in Social Work from Hunter College and did her training at New

York University. Jones-Soderman, however, has not been licensed in any State since 2010. Accordingly, she was not licensed at the time of her involvement in the issues in this case.

Jones-Soderman described herself as the Founder and the Executive Director of the FCVFC. According to Jones-Soderman, the FCVFC serves clients who are involved in custody matters in which a protective parent is facing false allegations that lead to a child being transferred to the hands of an abusive parent. The FCVFC became a non-profit in 2008, and Jones-Soderman does not receive a salary as the Director. In her role, she performs forensic and analytic evaluations, conducts family interviews, and reviews school records, documents available under the Freedom of Information Act, and the court history of a case. She described her practice as focusing on "highly disturbed patients" who are actively suicidal and suffer from acute psychiatric disorders. The FCVFC pays for her office and for accommodations, and she receives some income from Social Security and from her work as a private consultant and an expert witness.

Jones-Soderman testified that Jane and Scott Powell were divorced in 2008 following "serious domestic violence allegations and serious allegations of sexual abuse" of their minor children, C.P. and E.P. Jones-Soderman added, "Nevertheless, they had a 50/50 custody arrangement and [Mrs. Powell] gave [Powell] a key to her house so he could see the children and so he could have easy access to them."[4]

In 2011, the case was referred to the Department of Children of Families ["DCF"]; Dr. Eric Frazier served as an expert evaluator. (*See* Pl. Ex. 15). Jones-Soderman explained that Dr. Frazier "was not court appointed, but *agreed upon*, after referral from [Scott] Powell's attorney." According to Jones-Soderman, DCF investigated the claims of abuse and felt that, if C.P. and E.P.

---

[4]Jones-Soderman's recitation of the Powells' background is not credible. Though she alleged that Jane Powell accused her ex-husband of engaging in "serious sex abuse" of her children, she acknowledged that Jane Powell also agreed to a 50/50 custody arrangement and provided the alleged abuser a key to her home so he could have "easy access" to the children.

were in treatment, such treatment would "clarify" whether the children were victims of sexual abuse. Following these juvenile court proceedings in which DCF was involved, the court ordered a change in the custody arrangement such that *Jane Powell, not Scott Powell*, was limited to brief, supervised meetings with the children.

Approximately four years later, in July 2015, Mrs. Powell contacted Jones-Soderman to request an evaluation of her case so that she could try to regain custody of C.P. and E.P., then-ages 13 and 15, who were still in the sole custody of their father, Scott Powell. Mrs. Powell engaged Jones-Soderman through a memorandum of understanding, and Mrs. Powell paid her $3,500.00 as a retainer, and an additional $3,500.00 for her work on her case. In connection with assisting Mrs. Powell, Jones-Soderman reviewed the court records and familiarized herself with the history and "context of the case."

In addition to engaging Jones-Soderman, Mrs. Powell retained Attorney Alex Schwartz to modify the custody arrangement. Jones-Soderman spoke to Attorney Schwartz in 2015 and explained her plan to do a critique of the evaluator and to obtain her own experts, which she did.

Then, on March 16, 2016, eight months after Jones-Soderman began working with Mrs. Powell, C.P. and E.P. sent Jones-Soderman letters (Def. Exs. B-C) and a video statement. (Def. Ex. A). The children called Jones-Soderman the next day, on March 17, 2016, and relayed their fears of their father. According to Jones-Soderman, they told her that if she did not help them by that weekend, they planned to kill themselves. Jones-Soderman described the phone call as a three-hour "forensic evaluation" in which she solicited "very specific," "detailed" information from the children alleging sexual abuse by Scott Powell. Additionally, Jones-Soderman testified that, during the call, the girls discussed specific instances of abuse that had occurred in the previous 24-48 hours. At the conclusion of the call, Jones-Soderman believed that if she did not get them

out of the house that weekend, they would go through with their pact to kill themselves. Consequently, Jones-Soderman developed a plan with the children. She told them she would get in touch with Attorney Schwartz and that she wanted them to go to the New Canaan Police Department to file a report.

Jones-Soderman acknowledged that she was an unlicensed counselor at that time; she described herself as acting as a "forensic expert" and "mandated reporter." That said, she testified that she did not call DCF to report the allegations of abuse because she was "troubled by the criminal legalities" with "the relationship with DCF." Her actions weigh against her claim that she was acting in the best interest of the children.

At the time she first spoke to the children, she was aware of the previous DCF reports, the case history, and Dr. Frazier's 2011 report, in which he had concluded that the children were not being truthful in making allegations of sexual abuse.[5] Additionally, she had reviewed the orders by Judge Mary Sommer in the juvenile court and was "fully aware of its contents." That means that, at the time of the events at issue and when she spoke to the children in March 2016, Jones-Soderman was well aware that, after hearing from witnesses, ordering the children to be seen by a Lyme disease specialist, and ordering individual and interaction psychological evaluations of the parents and children, Judge Sommer ordered custody and guardianship to be transferred to Scott

---

[5] Dr. Frazier's 2011 report was admitted in full for the limited purpose of showing the impact the contents of the report had on Jones-Soderman because she published statements in direct response to this report. In this 2011 report, Dr. Frazier referenced two incidences in which Mrs. Powell reported that Scott Powell had sexually abused the children. (Pl. Ex. 15 at 7, 9, 19). In the first instance, Mrs. Powell made the report to DCF; DCF conducted an investigation, including forensic interviews of the children. (*Id.* at 7). The investigation produced "unfounded results"; DCF concluded that the allegations were "unsubstantiated." (*Id.*). Mrs. Powell explained to Dr. Frazier, "At the end [the children] said that nothing had happened at all and C[.P.] had talked E[.P.] into it." (*Id.* at 19). In the second instance, Mrs. Powell called DCF, but the allegation was "not accepted by the DCF investigator." (*Id.* at 9). She then reported her allegations to the New Canaan Police Department. (*Id.*). Following an investigation, the police concluded that the allegations were "[u]nfounded." (*Id.*).

Powell reported to Dr. Frazier "that he has never engaged any kind of abuse towards his children." (*Id.* at 7).

Powell. (*See* Pl. Ex. 16 at 2-3, 5). Jones-Soderman was aware also that, on October 28, 2011, Mrs. Powell had entered a plea of nolo contendere to an allegation of child neglect for denying "proper care" to both C.P. and E.P and that:

> As stipulated by the Rules of Practice, any attempt to initiate proceedings to modify or otherwise affect the custody orders of the juvenile court is without legal basis and subject to dismissal. The above rule of practice clearly requires that in factual circumstances presented by this case that any motion for modification or revocation of guardianship orders must be presented to the juvenile court which issues the original order. The Superior Court for Juvenile Matters at Stamford has jurisdiction over post disposition matters relating to custody and guardianship of the children in this case.

(Pl. Ex. 16 at 3, 6-7).

In spite of her detailed knowledge of the foregoing, Jones-Soderman worked with the children to remove them from Powell's care. Following their call to Jones-Soderman, C.P. arranged for she and E.P to sleep over a family friend's home that Saturday night, and the next morning, they planned to go to the New Canaan Police Department. Jones-Soderman testified that she drew up a complaint with the statements from the children to be sent to Attorney Schwartz who had been representing Mrs. Powell since July 2015. Jones-Soderman told the children they needed someone to pick them up on Sunday morning and bring them to the police station. Initially, they identified a family friend, but after speaking to Jones-Soderman, this family friend understood that her involvement could lead to her being sued. Jones-Soderman described this person as "insecure" and not "clearly committed[,]" so she asked the children to name another person, and they named their maternal grandparents, Cynthia and Rick Diehl.

Again, at that time, Jones-Soderman knew that Scott Powell had sole custody of the children and that there was a court order stating that he had full decision-making power regarding the level of communication between the children and their maternal grandparents. She was aware also that Jane Powell did not "like" or approve of the course of action she was orchestrating.

Nevertheless, Jones-Soderman called Cynthia and Rick Diehl to tell them that there was an "extremely serious" and "urgent matter[,]" that their granddaughters were in "very grave danger[,]" and that, the children were "suffering considerably" and thus, they needed the Diehls' assistance.

Rick Diehl testified that, when Jones-Soderman contacted him, he knew he was "suddenly becoming involved in a dramatic stroke of dire consequences." He found the allegations about Powell "so surprising[,]" but he felt he was between a "rock and a hard place" and that he had to act. After speaking to Mr. Diehl, Jones-Soderman spoke to the children again, and they "agreed to go through with the plan[]" of going to the police.

On Sunday morning, March 20, 2016, the Diehls picked up the children from their sleepover at their friend's home and took them to the police station.[6] Rick Diehl reported to the police that he had information that the children's lives were in danger in their home. The children then relayed their report to the officers, and, after a short meeting, the supervisor told them that a youth officer would speak to them further, which she did, the next day.

When the children got back in the car, they called Jones-Soderman to say that they felt the police believed them. C.P. told Jones-Soderman that she brought her diary with her, which Jones-Soderman thought demonstrated C.P.'s forethought and exhibited the "sense of gravity of the situation." According to Jones-Soderman, the children had told others of the abuse in the past, but they were "brushed aside and [Jones-Soderman] was the first person who heard them and attempted to help them." Jones-Soderman was aware at that time that the children's previous allegations had been determined to be "unfounded." (*See* Pl. Ex. 13 at 5).

---

[6] The Diehls knew that Powell had control over their ability to see the children, and Cynthia Diehl testified that, until March 20, 2016, they had not seen the children alone since he was granted sole custody.

The Diehls then brought the children to a hotel for the night. When they arrived at the room, C.P. went into a closet to call Jones-Soderman. According to Jones-Soderman, C.P. told her that she had to cut herself, that she had to die, and that Powell would find them and kill them all. Jones-Soderman asked her to send her a picture of her wound, which C.P. did. Jones-Soderman described it as a superficial scratch.

Despite her insistence that she had been acting solely to assist the girls and keep them safe, upon hearing from C.P. that she was cutting herself and was suicidal, Jones-Soderman did not call C.P.'s grandparents, the police, or DCF.

At some point that night, Rick Diehl learned that C.P. was in the closet. When he saw her, she was trembling, and he noticed that she had cut herself. He could see new marks as well as scars on her arms and legs. Jones-Soderman testified that C.P. was not suicidal at that point; she was just "stressed." She dismissed the cutting and suicidal statements as not concerning. Jones-Soderman stated that she "expected she was fine, she was in custody of her grandparents and perfectly well." Jones-Soderman added that, since that time, which included the following year in which she was in the custody of Scott Powell, C.P. never cut herself again. Accordingly, Jones-Soderman's own testimony casts doubt both on her claim that she was compelled to take all of these actions, including publishing the statements at issue in this case, to protect the children from imminent harm by Powell, and on her assumption that C.P. was engaging in these behaviors because of sexual abuse committed by Powell.

On the morning of Monday, March 21, 2016, Rick Diehl met with Mrs. Powell's counsel, Attorney Schwartz.[7] Cynthia and Rick Diehl moved for an Emergency Ex Parte Order of Custody

---

[7] Jones-Soderman initially testified that she, through the FCVFC, hired Attorney Schwartz for the children, but later admitted that Mrs. Powell retained had this attorney months before she contacted Jones-Soderman. Mrs. Powell retained both Attorney Schwartz and Jones-Soderman with the intent to seek a custody modification that was entirely unrelated to any allegations of sexual abuse.

["March 21, 2016 Ex Parte Order"], in which they detailed the complaints C.P. and E.P. made to the New Canaan Police. (Def. Ex. F). Rick Diehl [8] and Attorney Schwartz signed the emergency application. Superior Court Judge Erika Tindill granted the Diehls temporary custody and ordered them to "report their findings and suspicions to the Department of Children and Families." (*Id.*). That same day, DCF went to the Diehls' residence to inspect the home and interview the parties. Jones-Soderman received diary entries from C.P. either that next day, or the day thereafter, further detailing C.P.'s allegations of abuse. (Def. Ex. E).

Immediately following Judge Tindill's temporary custody order, Scott Powell filed an emergency ex parte application for custody, seeking the restoration of sole legal and physical custody and an order preventing visitation with the children's maternal grandparents — the Diehls, (Pl.'s Ex. 13 at 1-2).

Judge Tindill held an expedited hearing on March 24, 2016, at which time the "Court indicated [that an evidentiary hearing] would not take place unless the Court heard from Dr.

---

[8] In the Ex Parte Order bearing his signature, Rick Diehl certified that he has "not been a party or a witness or participated in any other capacity in cases in Connecticut or in any other state concerning custody [of] any child listed in this application." (Def. Ex. F). The Diehls have been involved in the Powells' custody dispute in the past. As Judge Tindill's noted in her April 22, 2016 Order, in 2013, Dr. Frazier recommended that "the children are not to have communication or access with the maternal grandparents." (Pl. Ex. 15 at 7). Accordingly, Judge Tindill ordered that whatever "access" was in effect under Judge Sommer's order shall resume, meaning that if Mr. Powell has the ability to make the decision regarding the Diehls' involvement in the children's lives, "we're reverting back to that." (Pl. Ex. 15 at 8).

Although Jones-Soderman argued that the Superior Court dismissed this ex parte application because it was signed by Rick Diehl, and not by the girls, there is no evidence to support that contention. First, Judge Tindill granted the Ex Parte Order on March 21, 2016. (Def. Ex. F). She noted that "any person presented with" the "heinous and serious allegations" contained in the ex parte application "would have done exactly what this Court did." (Pl.'s Ex. 15 at 1). Second, Judge Tindill did "not believe that the Diehls woke up one day and decided that they were going to make these allegations. [The Judge] believed that [the Diehls] . . . have been having contact with these girls over the years. And the girls contacted them and the Diehl[s] supported what they were told by these daughters." (Pl. Ex. 15 at 5). The Judge clearly stated that she did "not believe that [the Diehls] concocted this information." (*Id.*).

Of course, Judge Tindill made those statements *before* reviewing the case history and previous judicial orders. Once she reviewed the case history and Judge Sommer's orders and conducted a full evidentiary hearing, she reversed course entirely and ordered custody to revert back to Scott Powell. As discussed below, Jones-Soderman, conversely, believed those allegations with full knowledge of the case history and previous judicial orders.

Fra[z]ier, the [DCF] representative involved in this matter, as well as police officers who had contact with either the petitioners, respondents or the daughters." (Pl. Ex. 13 at 2). Judge Tindill continued the case, and on the third day of the evidentiary hearing, Judge Tindill vacated the March 21, 2016 Ex Parte Order and ordered Scott Powell "sole legal and physical custody as per the September 2012 orders . . . in the child protection action." (Pl. Ex. 13 at 10; *see* Pl. Ex. 16). The court could not find, based on the evidence before it, that there was "an immediate and present risk of physical danger or psychological harm" to the children. (Pl. Ex. 13 at 3-4). Judge Tindill ordered Powell to install surveillance cameras in his house (excluding the bathroom and the children's bedrooms) "to protect the girls[,]" and to "protect [Powell] if there are any additional allegations." (Pl. Ex. 13 at 18).

Jones-Soderman testified when the children learned that the court had restored custody to their father, they were "just beyond hysterical" and "acutely suicidal." According to Jones-Soderman and Rick Diehl, they were taken to Norwalk Hospital; they were admitted and released the next day.

According to Jones-Soderman, C.P. told her that, when they returned to Powell's house, he pulled E.P. into a bedroom, out of view of the cameras, and reiterated that the things the children had written in their letters did not happen. According to Jones-Soderman, she spoke to C.P. about emancipation, and C.P. eventually "basically hung up" on her.

Jones-Soderman testified that she published the allegations and writings that are the subject of this action, on the FCVFC website right after Judge Tindill issued her decision restoring custody to Powell. Jones-Soderman spoke to the children again on May 14 or May 15, 2016 about their belief that the government agencies and courts were meant to protect them, but the children told her that they would not go through the same process again. Jones-Soderman received a third letter

from the children on May 25, 2016, which she interpreted as evidence that C.P. was in "absolute despair." (Def. Ex. D). By then, the children were not exposed to the same abuse, but the "level of control . . . increased." (Def. Ex. D).[9] When C.P. turned 17, she emancipated herself. E.P. continues to live with her father.

Scott Powell testified that he first became aware of Jones-Soderman when the children were "taken" by the Diehls. Powell explained that he used the word, "taken" because there was a court order governing supervised visitation with Mrs. Powell, and Powell controlled when and how the Diehls would see the children. Similarly, Cynthia Diehl testified that Powell had control over when and how they saw the children. After Powell learned that his children were with the Diehls, he learned that Jones-Soderman had published multiple "false accusations[,]" which he described as the "worst kind of crimes" that he allegedly had done to his children, all of which made him "extremely sick." Powell testified that there was "never a scintilla of truth to any of th[o]se accusations[,]" and they remained on the internet for "close to a year or more." According to Powell, to this date, some accusations remain accessible electronically, and, when he searches his name, the results are linked to the phrase "sexual abuser."

Powell testified that he has a "good" relationship with both of his children. E.P. lives with him, and she does well in school, although he knows that Jones-Soderman's actions have "created" a lot of "issues" for her. C.P. is in college now, and she lives with her mother and grandparents. According to Powell, she communicates with him, and most recently, contacted him when she had a flat tire. Cynthia Diehl testified that C.P. was "extremely distraught" during the course of this trial once she learned that Jones-Soderman introduced her diary entries in support of her defense.

---

[9] An example of this "increased control" was Powell's use of a common application to track the cellular telephones used by his children, which, apparently, is a practice used by many parents. *See* https://www.wltx.com/article/news/parents-using-apps-to-track-childrens-every-move/101-521230812. (last visited January 10, 2020).

C.P. called Mrs. Diehl, crying and "extremely upset" that her father had found out what she had written about him.

Powell testified that his children were exposed to "brainwashing" by Jones-Soderman. Powell was aware of C.P.'s history of cutting herself, and he took her to therapy for this behavior. As he explained, he had full custody of C.P. and "took care of her." He took his children to every therapy appointment and was never aware that his children felt their lives were in danger.

Powell testified that Jones-Soderman's actions caused him to be sick to his stomach, suffer headaches, lose sleep, gain and lose weight, and they affected his memory and cognitive functioning. He described her statements as accusing him of the "worst crime" one could imagine. He testified that the publication of these false statements has impacted his social relationships and that he has social anxiety around any people who did not know him before these statements were published.

Powell worked as a camp director at a country club in Darien, Connecticut for fourteen years, earning approximately $15,000 each summer. In the Spring of 2016, right after Jones-Soderman published her first statements, he was not rehired and has never been able to return to the camp. He works as a home improvement contractor, but he does not advertise on the internet because he fears potential clients searching for him online and finding these false allegations.

II.    CONCLUSIONS OF LAW

The following constitutes the Court's conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1):

A.    FALSE ACCUSATIONS AT ISSUE:

There are ten allegedly false accusations at issue that were published on or about April 25, 2016:

1.    That living with Powell is "a death sentence" for Powell's children;
2.    That Powell is a "vicious abuser" of his children;

3.  That Powell is an "accused child abuser";

4.  That Powell's good reputation in his community is "based on the reluctance of those too fearful to take on the rage and intimidation to report him for crimes for which he should have been reported";

5.  That Powell, on an ongoing basis, "hits the buttocks of his younger daughter," and is "grabbing/patting [her] buttocks" and the breasts of his older daughter;

6.  That evidence of sexual assaults being committed by Powell upon his minor daughters "are now on camera . . . .";

7.  That Powell is "an accused child sexual abuser [who has been elevated] to the position of teacher in a program alerting parents to sexual abuse in the camp program, where he has been a long time camp Director at Woodway Country Club, in Darien, Connecticut. This camp Director has an institutional history, though undisclosed, of inappropriate behavior with teenage girls and children. He no longer works as a teacher, but rather as a carpenter in his own Business";

8.  That Powell has "threatened and intimidated" his daughters;

9.  That Powell is comparable to other prominent child abusers and that "the accused abuser, Scott Powell will not be allowed to languish under the veil of secrecy. He has forcibly, through threats, intimidation . . . been able to hide in plain sight. We expect that Scott Powell's reign of terror over his children . . . will not be allowed to prevail . . .";

10. That one of Powell's minor daughters (whose name Jones-Soderman published on her website) "was the major target of Scott Powell's aggressive abuse" while the other minor daughter (whose name she also published on her website) "was the target of Scott Powell's most aggressive sexual incursions."

Additionally, Jones-Soderman published the following allegations:

1.  Under the title, "BREAKING NEWS  The Powell Case —Articles —In Progress[,]" Jones-Soderman wrote: "The Untimely Death of a Beloved Grand Daughter, Daughter, Sister — Linked to Abuse by Scott Powell . . . Death of a Step Daughter, Linked to the Accused Abuser Scott Powell" (Pl. Ex. 2); Jones-Soderman testified that she published this on her website;

2.  Jones-Soderman testified that she was the interviewer for a radio program titled Predator in Possession, and on December 12, 2016, she published the self-described article on the Conscious Consumer Network website:

    "PREDATOR IN POSSESSION — S POWELL"
    . . .
    The legal representative of accused child abuser, S Powell of New Canaan, C[T], . . . has now come up with a new conspirator in

pursuing a vile campaign. Attorney John R. Williams of New Haven, C[T] has joined what can only be described as an upside down [lawsuit]. . . .

While the subject children were in the custody of their grandparents for a period of approximately a month, a series of experts became fully apprised of the depth and breadth of the conspiracy on the part of S Powell, psychologist Eric Fraz[i]er, caseworker supervisor for DCF Timothy Welch, DCF case work Ethel Moore, to cover the unconscionable abuse imm[i]nent harm, ongoing danger to which these children has been subject for more than five years of completely isolated custody in the grip of S Powell. The veil of silence facilitated by the slippery legal slope provided by the Judicial Discretion and wide birth of crimes covered by a Judge's liberty to 'believe' as opposed to know, these children have been living in hell for years.

The crimes committed by S Powell . . . have continued to be obfuscated by the fact that psychologist Eric Fraz[i]er has been allowed to disseminate false information, seriously challenged psychological reports . . . lacking in any scholarly gravis, or fact. The quagmire of junk science, false allegations, absence of factual foundation for orders written by a series of judges has compounded the misery of countless lives and forever altered the personal development, education, health and over all well being of the children at the center of this current fabricated [lawsuit].

(Pl. Ex. 4);

3.      On April 25, 2016, Jones-Soderman published on her website a "Complaint Against Judge Erika Tindill" in which she wrote:

On Fr. 4/22/2016 Judge Erika Tindill pronounced a death sentence for two adolescent girls who appeared through their attorney to seek relief from the brutal, unremitting terror, physical and emotional horror experienced and described by these two young girls. Their accounts of five years of abuse, which followed similar accounts of sexual, emotional abuse, animal abuse of their pets, prior to their removal from protective parent and extended family, at ages eight and eleven.

Judge Erika Tindill pronounced their death sentence after a hearing, 4/22/16 countering a Protective Order first issued 3/21/16. Judge Erika Tindill issued her order remanding the girls returned to their brutal abuser . . . .

(Pl. Ex. 5; *see also* Pl. Ex. 6).

B.    THE PLAINTIFF'S CLAIMS

Powell asserts claims of defamation *per se*, invasion of privacy, intentional infliction of emotional distress, and negligent infliction of emotion distress resulting from Jones-Soderman's publication of the foregoing statements.  The First Amendment, however, places limits on claims brought under a State's defamation laws, and on the related invasion of privacy and emotional distress claims. Accordingly, Jones-Soderman counters that Powell's claims must fail because her statements address matters of public concern and thus fall within the protection of the First Amendment.[10]

1.    THE FIRST AMENDMENT PROTECTION

"[S]peech on 'matters of public concern' . . . is at the heart of the First Amendment's protection" and, thus, is "entitled to special protection."  *Synder v. Phelps*, 562 U.S. 443, 451-52 (2011) (multiple citations & internal quotations omitted).  Consequently, the "Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits, including suits for intentional infliction of emotional distress."  *Id.* at 451. Moreover, the protection of the First Amendment "appl[ies] regardless of whether or not the form of the claim is defamation, false light invasion of privacy or some other alleged tortious conduct such as common-law negligence, negligent misrepresentation or negligent infliction of emotional distress."  *Traylor v. Parker*, No.

---

[10] In her answer, Jones-Soderman asserted the affirmative defense of "fair comment."  (Doc. No. 25 at 3).  "As a general rule . . . the privilege of fair comment applies to expressions of opinion." *Goodrich v. Waterbury Republican–American, Inc.*, 188 Conn. 107, 111 n.4, 448 A.2d 1317 (1982) (citations & emphasis omitted.)  Specifically, "[t]he privilege of 'fair comment,' which was one of the most important privileges realized at common law, was a qualified privilege to express an opinion or otherwise comment on matters of public interest." *Goodrich*, 188 Conn. at 114, 448 A.2d 1317.  In her post-trial briefing, Jones-Soderman argues that her statements addressed matters of public concern, protected by the First Amendment; she did not assert, and apparently no longer relies upon, the affirmative defense of fair comment.

135015533S, 2016 WL 5003981, at *8 (Conn. Super. Ct. Aug. 4, 2016) (citing *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 127-29 (2d Cir. 2013)).

Speech on matters of public concern is speech related to a "matter of political, social or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]" *Synder*, 562 U.S. at 453 (citations & internal quotations omitted). "As in other First Amendment cases, the court is obligated to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression. . . . In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Id.* at 453-54 (citations & internal quotations omitted). When speech is a matter of public concern, the speaker may be liable for "'damage to reputation . . . only if the statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Dongguk Univ.*, 734 F.3d at 129 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

In this case, the speech at issue relates to alleged sexual and physical abuse by Scott Powell. It is well established that "[t]he commission of [a] crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, . . . are without question events of legitimate concern to the public[.]" *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975). The "inquiry does not, however, end here, as we also must consider the form and context of the communications at issue." *Gleason v. Smolinski*, 319 Conn. 394, 416, 125 A.3d 920 (2015) (citing *Synder*, 562 U.S. at 454). The First Amendment may not be used as "an all-purpose tort shield[,]" *id.* (citation & internal quotation omitted), nor can it be "used as a cloak or veil for intentionally tortious

conduct that is only tangentially related to the claimed matter of public concern." *Id.* (multiple citations omitted).

The "vehicle, context and content of the messages" is of "paramount importance" in determining whether the communication at issue relates to a matter of public concern. *Id.* at 418. Jones-Soderman testified thoroughly about the form and context of her statements, as well as her motivations for publishing these statements. She explained that she "had" to post the statements at issue to prevent Powell from "promoting" his "false narrative[,]" and because she was concerned for the "welfare and protection of these children."[11] To achieve this goal, Jones-Soderman identified Powell by name in each statement and repeated allegations of physical and sexual abuse that had just been rejected by the Connecticut Superior Court.

She testified that her writings and statements "usually black boxed names[,]" but then retracted that claim and stood by her initial testimony that she intentionally posted information on the FCVFC website, in part, because she wanted to "out" Scott Powell.[12] This intention is evident in her comparison of Powell to other "prominent child abusers" and her statement that "the accused abuser, Scott Powell will not be allowed to languish under the veil of secrecy. He has forcibly, through threats, intimidation . . . been able to hide in plain sight. We expect that Scott Powell's reign of terror over his children . . .will not be allowed to prevail . . . ." Jones-Soderman contends that it was necessary to post these statements, and to identify Powell by name, because she believed

_____

[11] The Court cannot accept Jones-Soderman's claim that she was motivated to publish these statements by her concern for the children. As discussed above, Jones-Soderman did nothing to protect C.P. in response to C.P.'s April 19, 2016 phone call during which she reported suicidal thoughts, and documented her cutting behavior. Moreover, in addition to publishing Scott Powell's name, she published the full names of the minor children who she alleges are victims of sexual abuse, along with extraordinary details of the alleged sexual abuse that they suffered. And she directed the Diehls to violate a custody order by moving for an emergency ex parte custody order in March 2016 despite knowing that, in 2012, Judge Mary Sommer had ordered sole custody and guardianship to Scott Powell, and retained "jurisdiction of all issues relating to custody and visitation[.]" (Pl. Ex. 16 at 5).

[12] As discussed above, in "outing" Scott Powell, she also identified the minor children, whom she alleged were victims of sexual assault, by their first and last names.

that multiple professionals "failed" both the children and Mrs. Powell. She believed also that there "needed to be some oversight of his behavior" as he was "unrestrained at that point." Her "beliefs" guided her intention to inform the public about Powell's alleged behavior, while also taking it upon herself to go after Powell directly. There is, however, substantial evidence to counter her many beliefs regarding Scott Powell. Thus, while allegations of abuse are matters of public concern, Jones-Soderman cannot shield herself from liability if she made the statements with the "'knowledge that [they were] false or with reckless disregard of whether [they were] false or not.'" *Dongguk Univ.*, 734 F.3d at 129 (quoting *Hustler Magazine*, 485 U.S. at 52 (quoting *New York Times Co.*, 376 U.S. at 279-80).

On cross examination, Jones-Soderman acknowledged that, at the time she published the statements at issue, she was in a contractual relationship with Jane Powell, a fact that she did not discuss or volunteer during her direct testimony. Indeed, during her direct testimony, she explicitly stated that the children had contacted her "out of the blue" because of her website, giving the impression that she had no prior connection to the Powell family. Additionally, as part of her work with Mrs. Powell, she had reviewed all the court records, evaluations, and related filings *prior* to when C.P. and E.P. had reached out to her with their allegations of abuse. (*See* Def. Ex. A-B). Thus, her initial testimony that she felt obliged to help the girls when they reached out to her "out of the blue" is simply not credible. She was also well aware that the earlier court records documented a history of neglect by Jane Powell and that Judge Sommer had transferred custody to Powell only *after* considering Dr. Frazier's reports and hearing evidence from witnesses, including DCF workers, school officials, Jane Powell's therapist, and a former nanny of the children. (Pl. Ex. 16). Although Jones-Soderman clearly disagreed with Dr. Frazier's findings, she conveniently ignores the fact that Judge Sommer also considered testimony from Dr. Rodolfo

Rosado, who *Jane Powell* retained for a psychological evaluation in connection with the custody and neglect proceedings, and whose findings were, at least in part, consistent with Dr. Frazier's findings. Moreover, Jones-Soderman was aware that Dr. Frazier's clinical findings included "evidence that [the children] suffered from Factitious Disorder NOS (Munchausen by Proxy), parental emesh[m]ent, educational and emotional neglect and parental alienation[]" (Pl. Ex. 16 at 2), and that "[b]oth Dr. Frazier and Dr. Shapiro [a Lyme disease specialist] found that the girls were in imminent risk of danger" if they remained in their mother's care. (*Id.*).

Jones-Soderman was likewise aware of Judge Tindill's April 22, 2016 order returning the children to their father *before* she published the statements about him. She knew that, before reaching her decision, Judge Tindill had considered the following information and took the following steps: (1) she reviewed "email exchanges"; (2) she reviewed the "reports of [Dr. Frazier] from 2011 [and] 2013[]"; (3) she spoke to Judge Sommer "who made the September 2012 order in the child protection case"; (4) she spoke to Judge Randolph, the presiding judge of the Juvenile Court in Stamford; (5) she reviewed the transcript of the deposition of police officer Andrea Alexander, who took the children's complaint on March 21, 2016; (6) she heard from the DCF Supervisor and Sergeant DeFelice of the New Canaan Police Department; (7) she took judicial notice of the dissolution action between the Powells; (8) she took judicial notice of a criminal case pending with a classmate of C.P. who was charged with felony counts of sexual assault, unlawful restraint, and other charges; (9) she reviewed the referral for Dr. Frazier that was conducted in April 2016; (10) she reviewed "selected relevant portions of the 1990 dissolution action between Mrs. Powell and her former husband; and, (11) she reviewed the attendance records of E.P. (Pl. Ex. 13 at 3). Furthermore, Jones-Soderman was aware, as Judge Tindill had noted, that previous allegations of the children against Scott Powell of sexual assault, harm, emotional neglect, physical

and emotional abuse were investigated by DCF, and the police, and "have always been unfounded[.]" (Pl. Ex. 13 at 4).

In response to this information, Jones-Soderman simply maintained, without any evidence in support, that Judge Tindill's hearing was so flawed that she "was forced to write" about the flaws herself, publish those writings on her website, and "out" Scott Powell. She maintained that she is a citizen with the ability to express her opinions even if she has to "pay for those responsibilities[,]" and she testified that posting her writings and allegations was a "conscious clear decision with full knowledge that there could be consequences for it." Thus, even if her speech touched on a matter of public concern, Jones-Soderman is liable for any statements made "'with knowledge that [they were] false or with reckless disregard of whether [they were] false or not.'" *Dongguk Univ.*, 734 F.3d at 129 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

The vehicle that Jones-Soderman used to publish her statements—the internet—reaches a vast audience, and information posted cannot easily be removed. Jones-Soderman initially published some statements on April 25 or 26, 2016, within days of Judge Tindill's order. She published additional allegations in May and June 2016. She admitted she was the author of each of the posted writings at issue, and that each of them was posted at her direction.

Jones-Soderman's testimony evolved and changed as she discussed when she removed the references to Scott Powell from her website. First, she testified that she removed all references to Scott Powell when DCF became actively involved and placed cameras in Powell's home, which occurred, according to her testimony, on April 26, 2016. That date actually coincides with the date she first published the alleged defamatory writings. She also testified, however, that she removed the writings because her concerns "went down" once DCF was involved, there was a plan for

emancipation, and cameras had been installed. That testimony implied that the statements were taken down almost immediately after they were posted. That was not the case. Jones-Soderman posted several additional writings in May and June 2016, and again in December 2016. (*See* P. Ex. 2). She later corrected her testimony to say that "DCF effectively took over in June 2016[,]" but "essentially closed the case in *May 2016*." She also testified that, in terms of newsworthiness, the writings became "stale" after being online for about three months, so they were archived at that point and replaced by other material. Ultimately, Jones-Soderman admitted that did not take the statements off her website until April 2017, over a year after Judge Tindill's order.

Given the broad public posting of these statements, the context of the posting of these statements after Jones-Soderman and Jane Powell had been contractually engaged in an effort to modify the Powells' custody arrangement, the fact that Jones-Soderman specifically, and repeatedly, identified Scott Powell in these posting which she kept up for more than a year, and, most importantly, the fact that these statements were made with a reckless disregard for their veracity, the Court concludes that the statements made by Jones-Soderman are not shielded by the protections of the First Amendment. Accordingly, the Court now turns to Powell's claims for defamation.

2.      DEFAMATION *PER SE*

"Defamation is comprised of the torts of libel and slander. . . . Slander is oral defamation . . . . Libel . . . is written defamation." *Gambardella v. Apple Health Care, Inc.*, 86 Conn. App. 842, 850, 863 A.2d 735 (2005) (citation & internal quotations omitted). "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. . . ." *Cweklinsky v. Mobil Chem. Co.,* 267 Conn. 210, 217, 837 A.2d 749 (2004).

"Although defamation claims are rooted in the state common law, their elements 'are heavily influenced by minimum standards required by the First Amendment.'" *Gleason*, 319 Conn. at 430, 125 A.3d 920 (quoting *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) (additional citations & footnote omitted). In Connecticut, "to establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gleason*, 319 Conn. at 430, 125 A.3d 920 (citation, internal quotations, alteration & footnote omitted).

An allegedly-defamatory statement is actionable *per se* if it accuses the plaintiff of a crime punishable by imprisonment. *Gleason*, 319 Conn. at 430 n.31, 125 A.3d 920; *see Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014) (holding that defamation *per se* requires that the "[defamation] . . . be one which charges a crime which involves moral turpitude or to which an infamous penalty is attached"). Jones-Soderman admits that she published these statements on the FCVFC website and that the allegations made in many of these statements accused Powell of criminal conduct punishable by imprisonment.

"A defendant may shield [herself] from liability for defamation by asserting the defense that the communication is protected by a qualified privilege." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 628, 969 A.2d 736 (2009) (citation omitted). "When considering whether a qualified privilege protects a defendant in a defamation case, the court must resolve two inquiries. The first is whether the privilege applies, which is a question of law . . . ." *Id.* (citation omitted). "The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact." *Id.* (citation omitted). The privilege is abused, and thus, may be

defeated, "if it can be established that the holder of the privilege acted with malice in publishing the defamatory material[,]" *id.* at 630 (citations omitted), "or if the scope or manner of publication exceeds what is reasonably necessary to further the interest." *Bleich v. Ortiz*, 196 Conn. 498, 501, 493 A.2d 236 (1985) (multiple citations omitted). As the Connecticut Supreme Court has explained, "for more than 100 years, this court has concluded that a qualified privilege is lost upon a showing of *either* actual malice, i.e., publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, *or* malice in fact, i.e., publication of a false statement with bad faith or improper motive." *Gambardella*, 291 Conn. at 630-31 (collecting cases); *see also id.* at 634 ("To the extent that further clarification is needed as to the meaning of these terms, we define actual malice as the publication of a false statement with knowledge of its falsity or reckless disregard for its truth, and malice in fact as the publication of a false statement with bad faith or improper motive."). "[M]alice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive." *Bleich*, 196 Conn. at 504, 493 A.2d 236 (multiple citations omitted).

"Lastly, truth is an absolute defense to an allegation of defamation[,]" and "a defendant need not establish the literal truth of the allegedly defamatory statement; rather, substantial truth provides an affirmative defense[.]" *Skakel*, 5 F. Supp. 3d at 207 (multiple citations omitted). "[T]he determination of the truthfulness of a statement is a question of fact for [the decisionmaker]. As a defense, truth provides protection against liability, but not against the expense and inconvenience of being sued." *Cweklinsky,* 267 Conn. at 228-29, 837 A.2d 759. As the Connecticut Supreme Court has explained, "the modern rule is that only substantial truth need be shown to constitute the justification. . . . It is not necessary for the defendant to prove the truth of every word of the libel. If he succeeds in proving that the main charge, or gist, of the libel is true,

he need not justify statements or comments which do not add to the sting of the charge or introduce any matter by itself actionable. . . ." *Goodrich*, 188 Conn. at 112–13, 448 A.2d 1317 (citations & internal quotations omitted).

"Whether a defendant has knowledge of the falsity of a defamatory statement is a question within the province of the trier of fact. . . . The proper inquiry is whether a defendant believes, honestly and in good faith, in the truth of his statements and whether he has grounds for such belief. . . ." *Gleason*, 319 Conn. at 448–49, 125 A.3d 920 (quoting *Gambardella*, 291 Conn. at 637–39, 969 A.2d 736). False accusations of criminal wrongdoing are not protected by the First Amendment merely because they invoke matters of public concern. "[C]ontemporary first amendment case law establishes that the public concern inquiry is a significant, but not dispositive, factor in determining whether speech or conduct is constitutionally protected for purposes of tort liability. Indeed, should an accusation be false, the first amendment does not foreclose liability under a defamation theory in a well pleaded and proven case." *Gleason*, 319 Conn. at 427 n.26, 125 A.3d 920.

Jones-Soderman argues that there was "no indication that [she] believed the statements to be false, or that [she] acted with reckless disregard as to their truth or falsity." (Doc. No. 102 at 18). The trial court is not required merely to accept a defendant's self-serving assertion that she published a defamatory statement without knowing that it was false. *Gambardella*, 291 Conn. at 637–39, 969 A.2d 736. "A trial court must evaluate a defendant's testimony, including whether there are grounds to support it, and is not constrained simply to accept a defendant's assertion that [she] did not know that [her] statement was false." *Id.* at 641-42, 969 A.2d 736 (noting that "[t]he fact that the defendants continued to assert that they believed that the plaintiff had stolen the furniture was not dispositive of the issue of whether they had known that their statements were

false or recklessly disregarded their truth.") (citing *Holbrook v. Casazza,* 204 Conn. 336, 349–50, 528 A.2d 774 (1987)). This means that, in this case, Jones-Soderman cannot prevail by maintaining that she believed what the children said, when there was ample information contradicting their allegations. It is up to the trier of fact to weigh the defendant's testimony, and "[i]t is axiomatic that a defendant who closes [her] eyes to the facts before [her] cannot insulate [herself] from a defamation charge merely by claiming that [she] believed [an] unlikely statement." *Gambardella,* 291 Conn. at 641-42, 969 A.2d 736 (holding that there was sufficient evidence to support the trial court's finding of actual malice).

"As the United States Supreme Court aptly stated: The defendant in a defamation action . . . cannot . . . automatically [e]nsure a favorable verdict by testifying that [s]he published with a belief that the statements were true." *Gleason*, 319 Conn. at 448, 125 A.3d 920 (quoting *Gambardella*, 291 Conn. at 637–39, 969 A.2d 736). The court, as the finder of fact in a bench trial, must determine "whether the publication was indeed made in good faith." *Id.* A defendant's "[p]rofessions of good faith will be unlikely to prove persuasive . . .*when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation* . . . ." *Id.* (emphasis added). That is precisely the situation in this case.

As discussed above, there are several facts established by, among other things, judicial decrees, that counter the allegations about Scott Powell. As Jones-Soderman explained, when Jane Powell engaged her to assist with a custody modification in July 2015, she conducted forensic and analytic evaluations, which included conducting family interviews and reviewing school records, documents available under the Freedom of Information Act and the court history of the case. Thus, as discussed thoroughly above, Jones-Soderman was well aware of the previous court orders and, in particular, that Judge Tindill had based her April 2016 decision to return C.P. and E.P. to Scott

Powell's custody on a consideration of a substantial amount of evidence, including the complex history of this custody dispute in which there had been absolutely no support for the allegations of physical or sexual abuse. This evidence consistently raised doubt as to the veracity of the claims C.P. and E.P leveled against their father. *See St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S. Ct. 1323 (1968) (holding that professions of good faith will unlikely prove persuasive where a story is fabricated, it is the product of imagination, or it is based on unverified, anonymous information). Additionally, not only had several different court orders placed the children in the custody of Scott Powell, prior to when Jane Powell had been charged with child neglect, she herself had agreed to a custody arrangement with Powell that had allowed him, in Jones-Soderman's words, "easy access" to her daughters. Jane Powell's custody arrangement with her ex-husband does not comport with allegations that he was sexually and physically abusing his daughters. Jones-Soderman's testimony is simply not credible, and, in light of the detailed history of this case, "only a reckless [woman] would have put" the "inherently improbable" allegations made by the children into circulation. *Gleason*, 319 Conn. at 448, 125 A.3d 920 (quoting *Gambardella*, 291 Conn. at 637–39, 969 A.2d 736 (emphasis added)).

Despite the "probable falsity" of the statements published by Jones-Soderman, which detailed sexual and physical abuse, *see Woodcock v. Journal Publishing Co.*, 230 Conn. 525, 540, 646 A.2d 92 (1994), Jones-Soderman continued "to profess [her] belief[.]" *Gambardella*, 291 Conn. at 641, 969 A.2d 736. "Adhering to a demonstrably false and groundless belief and publishing that belief is, purely and simply, reckless disregard for the truth." *Id.* (citing *Holbrook v. Casazza*, 204 Conn. 336, 348–49, 528 A.2d 774 (1987); *St. Amant*, 390 U.S. at 732, 88 S. Ct. 1323; *see also Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn.1, 29–30, 662 A.2d 89 (1995) (inferring actual malice when defendant intentionally made statement with

improper motives and failed to investigate or retract statement after being notified it was false)). While Jones-Soderman may have believed the girls, and thus, believed, "honestly and in good faith, in the truth of [her] statements[,]" that belief is not enough to overcome liability for defamation. *Gambardella*, 291 Conn. at 638, 969 A.2d 736 (citing *Charles Parker Co. v. Silver City Crystal Co.*, 142 Conn. 605, 618, 116 A.2d 440 (1955)). Jones-Soderman must also have had "grounds for such belief." *Id.* Here, she did not. Jones-Soderman's own beliefs dictated her behavior, despite the factual record. "It is axiomatic that a defendant who closes [her] eyes to the facts before [her] cannot insulate [herself] from a defamation charge merely by claiming that [she] believed [an] unlikely statement." *Id.* at 642.

Additionally, Jones-Soderman offered no testimony to support her statement that evidence of sexual assaults being committed by Powell upon his minor children "are now on camera . . . ." To the contrary, she testified that her concerns about the children "went down" once the cameras were placed in Powell's home. Jones-Soderman was aware, from her review of Judge Tindill's orders, that those cameras were installed, in part for the protection of the children, but also to protect Powell from any "additional allegations" since none of the allegations made by the girls had been substantiated at that time. (Pl. Ex. 13 at 18).

Moreover, as discussed above, the "scope or manner of [Jones-Soderman's] publication exceed[ed] what [wa]s reasonably necessary to further that interest." *Bleich*, 196 Conn. at 501. Jones-Soderman posted her statements and allegations for over a year on a broad, public forum. Additionally, in her defamatory writings, she claimed that Connecticut judges, police officers and the Department of Children and Families all colluded with Powell so that he could continue engaging in sexual and physical abuse of his children, and she identified the minor children by

name, with utter disregard for their privacy. As set forth above, regardless of what Jones-Soderman may have believed, she made these publications with a reckless disregard for their veracity.

3. <u>INVASION OF PRIVACY</u>

"The distinction between privacy and defamation actions, based on the same facts, is that the former provides redress for the emotional response and mental suffering for not being let alone, while the latter provides relief for the injury to one's reputation." *Jensen v. Times Mirror Co.*, 634 F. Supp. 304, 309-10 (D. Conn. 1986) (citing *Goodrich*, 188 Conn. at 128, n.19, 448 A.2d 1317 (additional citations omitted)). A false light invasion of privacy occurs if "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Goodrich*, 188 Conn. at 131, 448 A.2d 1317 (internal quotation marks omitted). "An essential element of a false light invasion of privacy claim is that the defendant gives publicity to false information." *Pace v. Bristol Hosp.*, 964 F. Supp. 628, 630–31 (D. Conn. 1997) (citing *Handler v. Arends*, No. 527732 S, 1995 WL 107328, at *11 (Conn. Super. Ct. March 1, 1995)). To establish "publicity[,]" the plaintiff must produce "proof not merely of limited, private communication to one or more other persons, but of widespread communication to the general public or a significant segment thereof." *Id.* (quoting *Handler*, 1995 WL 107328, at *11).

Here, as set forth in detail above, Powell has proven that Jones-Soderman, in publishing the statements at issue, acted in reckless disregard of the truth, that the content of the statements, which detailed sexual abuse of Powell's minor daughters, was "highly offensive to a reasonable person," and that, by posting the statements online for over a year, she disseminated the information to "the general public or a significant segment thereof." *Id.* Accordingly, Powell has

proven his claim for invasion of privacy.

4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To establish a claim for intentional infliction of emotional distress, the plaintiff must allege "(1) that the actor intended to inflict emotional distress or that [s]he knew or should have known that emotional distress was the likely result of [her] conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ.*, 254 Conn. 205, 210, 757 A.2d 1059 (2000). "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Muniz v. Kravis*, 59 Conn. App. 704, 708, 757 A.2d 1207 (2000) (internal citation & quotation marks omitted). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" 1 Restatement (Second), Torts § 46, comment (d), p. 73 (1965).

Given the severity of the allegations at issue, the significant judicial record in this case, and Jones-Soderman's acknowledgment that she intended to "out" Powell for conduct she believed he had done despite her awareness of the case history, the Court concludes that Jones-Soderman's conduct was extreme. Powell, however, has not established that he suffered severe emotional distress as a result of Jones-Soderman's statements. *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986) (holding that severe emotional distress is a necessary allegation to prevail on a claim

for intentional infliction of emotional distress).

Powell testified that, as a result of the defamatory statements that Jones-Soderman published, he suffered headaches, sleeplessness and loss of appetite and that his social relationships also suffered. He did not seek medical treatment, and, although a failure to seek medical treatment does not preclude a finding of severe emotional distress, *Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 175 (D. Conn. 2003), he did not testify as to the intensity and frequency of his headaches, sleeplessness and appetite fluctuation, all of which can be common responses to stress. Thus, the Court finds that Powell has not carried his burden of proof on the intentional infliction of emotional distress claim because he has failed to establish the fourth element, requiring him to establish that his emotional distress was severe.

### 5. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

To state a claim of negligent infliction of emotional distress, a plaintiff must prove that:

> (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.

*Hall v. Bergman*, 296 Conn. 169, 182 n.8, 994 A.2d 666 (2010) (quoting *Carrol v. Allstate Ins.*, 262 Conn. 433, 444, 815 A.2d 119 (2003)). As the Court concluded in Section II.B.4 *supra*, Powell has not proven that his emotional distress was so severe that it has resulted in illness or bodily harm. Thus, the Court finds that Powell has not carried his burden of proof on the negligent infliction of emotional distress claim.

### C. DAMAGES

Under Connecticut law, the type of damages recoverable under a defamation claim depend on the nature of the defamatory statements. *Dongguk Univ. v. Yale Univ.*, No. 08-CV-0441 TLM, 2012 WL 441250, at *10, *on reconsideration in part*, 873 F. Supp. 2d 460 (D. Conn. 2012),

and *aff'd*, 734 F.3d 113 (2d Cir. 2013), and *aff'd,* 734 F.3d 113 (2d Cir. 2013). "If a defendant's statements are defamatory *per se*, the plaintiff may recover both actual damages and "general damages"—that is, non-pecuniary damages that compensate the plaintiff's intangible loss of standing in the community." *Id.* (quoting *DeVito v. Schwartz,* 66 Conn. App. 228, 235, 784 A.2d 376 (2001)). "In the case of a statement that is defamatory *per se*, injury to a plaintiff's reputation is conclusively presumed such that a plaintiff need plead nor prove it." *Gleason*, 319 Conn. at 430 n.31, 125 A.3d 920.

Powell testified that, as a result of the defamatory statements Jones-Soderman published, he experienced headaches, sleeplessness and loss of appetite, and his social relationships suffered, all of which fall within "garden variety" emotional distress claims. "In 'garden variety' emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury.'" *Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 376 (D. Conn. 2016) (quoting *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)). "'Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration.'" *Id.* (quoting *Olsen*, 615 F. Supp. 2d at 46); *see also Johnson v. Strive E. Harlem Emp't Grp.*, 990 F. Supp. 2d 435, 456–57 (S.D.N.Y. 2014) (holding plaintiff proved "garden variety" emotional distress "at best" where she relied on her own testimony regarding her emotional reaction to racial epithets and sexual harassment at work, her loss of energy and confidence, crying, becoming a less effective parent, having trouble sleeping, and seeing two therapists, but offered no corroborating testimony, nor any evidence of physical manifestations of her distress); *Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388, 2012 WL 6720919, at *16 (S.D.N.Y. Dec. 18, 2012) (finding "garden variety" emotional distress where plaintiff offered

evidence, corroborated by other witnesses, that he was hurt, stressed, "not himself," and gained weight. In light of the content of allegations at issue in this case, the Court concludes that an award of $40,000 for emotional distress damages is appropriate. *See Vera*, 189 F. Supp. 3d at 378-79 (collecting cases awarding "garden variety" emotional distress damages ranging from $40,000-$125,000); *see also Olson*, 615 F. Supp. 2d at 46 (collecting cases awarding "garden variety" emotional distress damages ranging from $30,000 to $125,000).

Powell testified that he has suffered a loss of actual income in the amount of $60,000 to date, because he lost his summer position as a camp director as a result of Jones-Soderman's defamatory statements. While several of the published statements would have an impact on the Powell's ability to work with children, Jones-Soderman specifically targeted Powell's summer position, stating that Powell was "an accused child sexual abuser [who has been elevated] to the position of teacher in a program alerting parents to sexual abuse in the camp program, where he has been a long time camp Director at Woodway Country Club, in Darien, Connecticut. This camp Director has an institutional history, though undisclosed, of inappropriate behavior with teenage girls and children. He no longer works as a teacher, but rather as a carpenter in his own business[.]"[13] An award of $60,000 for lost actual income, therefore, is appropriate.

Powell also testified that he has suffered uncalculated business losses as a result of his reluctance to advertise his home improvement business online because of the negative

---

[13] Jones-Soderman's testimony that she wrote about Powell's conduct as a camp director after "doing various background checks and extensive review of his background[,]" and based on statements made to her by C.P. and E.P. is not credible. According to Jones-Soderman, the children garnered their information about Powell's conduct as a camp director while they themselves were working as camp counselors. Yet, the girls were thirteen and sixteen years old at the time they met Jones-Soderman; it is unclear just how old they were when they were allegedly working at this summer camp. Indeed, Jones-Soderman's testimony on this issue was confusing, incredible and impossible to understand in light of the other objective facts. Additionally, although she allegedly received reports from C.P. and E.P. regarding their father's behavior at the camp, Jones-Soderman, a mandated reporter, never reported the information to DCF. As discussed above, to the extent that the children ever made allegations regarding Powell's conduct at camp, Jones-Soderman's reliance on this information was unreasonable under the circumstances in this case.

consequences if potential customers searched the internet using his name. Here, he did not provide an estimate of this lost business. Though it is certainly possible or even probable that the content of the defamatory statements could have impacted Powell's business, there is insufficient evidence in the record to allow the Court to estimate a figure for lost business and any attempt to do so would be speculative, at best.

In addition to compensatory damages, Powell seeks punitive damages, which under Connecticut law, are the non-taxable costs of litigation, which predominantly consists of attorney's fees. *Ulbrich v. Groth*, 310 Conn. 375, 447–48, 78 A.3d 76 (2013). In cases in which First Amendment implications exist, such as this case, "the clear and convincing evidence standard furnishes the applicable standard of proving actual malice to sustain an award of punitive damages to a private figure plaintiff." *Gleason*, 319 Conn. at 432 n.32, 125 A.3d 920 (multiple citations omitted); *see Triangle Sheet Metal Works, Inc. v. Silver*, 154 Conn. 116, 127, 222 A.2d 220 (1966). Clear and convincing evidence is "a more exacting standard" of proof than proof by a preponderance of evidence. *United States v. Thomas*, 274 F.3d 655, 672 (2d Cir. 2001). There must be "evidence indicating that the thing to be proved is highly probable or reasonably certain." *Ragbir v. Holder*, 389 F. App'x 80, 84-85 (2d Cir. 2010) (citation, internal quotations & alterations omitted).

As discussed above, Powell proved by a preponderance of evidence actual malice, which in this circumstance, is reckless disregard for the falsity of Jones-Soderman's statements. The multiple judicial findings in the case history do not support the statements that Jones-Soderman "believe[d]" to be true. She testified that she researched the case history, conducted her own interviews, reviewed school records, and performed her own evaluations. The information she garnered from her review of the records in this case countered the allegations made by the children.

Yet, even with this background, she believed the children's allegations, in part, because of their demeanor during their many phone calls and in the video they sent to Jones-Soderman, and because of the content of the letters and the detailed allegations in C.P.'s diary entries. (Pl. Exs. A-E). Under the circumstances, the Court cannot conclude that Powell proved by the heightened standard of clear and convincing evidence, that Jones-Soderman's statements were made with reckless disregard to their veracity. Accordingly, an award of punitive damages is not appropriate.

III.     CONCLUSION

Accordingly, for the reasons stated above, the defendant's Motion for Judgment on Partial Findings (Doc. No. 91) is DENIED. The Clerk is directed to enter judgment in favor of the plaintiff in the amount of $100,000.

Dated at New Haven, Connecticut, this 14th day of January, 2020.

   /s/ Robert M. Spector
Robert M. Spector
United States Magistrate Judge